[Cite as *State v. Carney*, 2020-Ohio-2691.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-402 |
| v. | : | (C.P.C. No. 17CR-2569) |
| Sean E. Carney, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 28, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief:** *Yavitch & Palmer, Co.*, and *Jeffrey A. Linn, II*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Sean E. Carney, appeals from a judgment of the Franklin County Court of Common Pleas entered on May 29, 2019, imposing a two-year prison sentence for felonious assault and tampering with evidence. Because we conclude that Carney's convictions were sufficiently supported and not against the manifest weight of the evidence, we overrule both of Carney's assignments of error and affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 10, 2017, a Franklin County Grand Jury indicted Carney for felonious assault and tampering with evidence arising out of an incident in which Carney stabbed a 15-year-old, S.A., four times and then allegedly sought to impair the prosecution by laundering blood-stained clothes. (May 10, 2017 Indictment.) Carney pled "not guilty." (May 12, 2017 Plea Form.) At one point, Carney pled guilty to attempted felonious assault. (May 23, 2018 Plea Form.) However, before sentencing, Carney dismissed his counsel and

withdrew his plea.  (May 23 and Aug. 7, 2018 Hearing Tr. in passim, filed Aug. 5, 2019.)  Thereafter, the court held a trial on the indicted offenses in late April and early May 2019.[1]

{¶ 3}   Eight witnesses testified at trial: three police officers who responded to the scene, investigated the incident, and arrested Carney; a paramedic who treated S.A.; S.A.'s girlfriend, who witnessed the incident; S.A.'s mother; S.A. himself; and Carney.  (Tr. in passim.)  In addition to the testimony of the witnesses, the parties introduced a number of photographs including photos of the scene, the bloody knife, and the victim.  (State's Exs. A1-A21, B1-B3, C1-C5, I1-I8.)  The parties also stipulated that DNA from a knife recovered at the scene belonged to Carney and S.A. and that a blood droplet swabbed from Carney's dryer was Carney's blood.  (Tr. at 376-77.)

{¶ 4}   An officer of the Bexley Police Department was the first witness to testify.  He said he was working on May 1, 2017, when, near 6:00 p.m., he responded to South Roosevelt Avenue in Bexley.  (Tr. at 171-72, 178-79.)  On entering the residence, he saw a teenager sitting on a sofa with people holding towels to his back.  (Tr. at 173.)  When the towels were removed briefly, he observed a big open slash wound to the minor's back.  (Tr. at 175-76.)  He found a folding knife in a back bedroom of the home.  (Tr. at 175.)  Medics responded to the scene, bandaged the teenager, and transported him to the hospital.  (Tr. at 176.)

{¶ 5}   The next witness to testify was a detective sergeant, also of the Bexley Police Department.  (Tr. at 183.)  The detective sergeant recounted that he was also called to South Roosevelt Avenue regarding a stabbing.  (Tr. at 184-85.)  He personally collected the knife found at the scene and described it as a folding knife that had to be manually unfolded and opened.  (Tr. at 190, 200.)  He observed blood droplets in the detached garage where the incident apparently occurred.  (Tr. at 195.)  The detective photographed S.A. and documented multiple stab and slash wounds.  (Tr. at 205-07.)  Ultimately, during the investigation, the detective was informed that Carney was the suspect, and he obtained his address. (Tr. at 212-14.)

{¶ 6}   Approximately two and one-half hours after beginning the investigation, the detective went to Carney's residence.  (Tr. at 214, 237.)  At Carney's residence, the detective

---

[1] The transcript of the trial and sentencing was filed in two consecutively paginated volumes on August 5, 2019 and will be cited herein solely by "Tr." followed by the page number.

first encountered Carney's mother who denied he was present. (Tr. at 214.) Then, after seeing Carney through a window of the home, officers were able to arrest Carney. (Tr. at 215.) When asked where the clothes were that Carney had been wearing at the time of the stabbing, Carney, who was very intoxicated and bore abrasions to his head and hand, indicated that the clothes were in the washing machine. (Tr. at 216-17.) The detective documented Carney's injuries at the time and acknowledged that sometimes blunt force injuries to the nose and face look worse after one day or two. (Tr. at 224, 236-37.) Though the detective did not recount the content of his interviews with witnesses to the stabbings, he agreed that their statements were not consistent about the order of the events in the altercation as he had learned in his investigation. (Tr. at 245.)

{¶ 7} The next witness was a paramedic who responded to the scene on May 1, 2017 and cared for S.A. (Tr. at 249.) The paramedic testified that he observed a large laceration to S.A.'s back from his shoulder toward his spine that exposed a good deal of tissue and, perhaps, some of the shoulder blade itself. (Tr. at 250-51.) He also noted that S.A.'s shoulder was bleeding heavily. *Id.* The paramedic treated S.A. with a trauma dressing, oxygen, and a large bore intravenous line, because S.A. appeared pale. (Tr. at 251-53.) He then transported S.A. by ambulance to the hospital. *Id.* The paramedic agreed that bruising and swelling can sometimes look worse one day or two after an injury. (Tr. at 256-58.)

{¶ 8} The plaintiff-appellee's, State of Ohio, final investigatory witness was another officer of the Bexley Police Department. (Tr. at 259.) The officer testified that he helped to arrest Carney. (Tr. at 261.) He said that, as he transported Carney after his arrest, Carney spontaneously remarked something to the effect of, "I'm surprised it took you so long to come to my house," and expressed that he had been waiting for the police. (Tr. at 263.)

{¶ 9} The next witness was S.A., the victim. S.A. testified that on May 1, 2017, he was 15 years old and lived at South Roosevelt Avenue in Bexley with his father, mother, brother, and sister. (Tr. at 289, 294.) Carney, he explained, was a friend of his father's. (Tr. at 290-91.) S.A. said that on the day in question, he, his girlfriend, and two other male friends were all socializing. (Tr. at 292-93.) They decided to go to the back of the house to smoke some marijuana and encountered his father and Carney sitting in chairs in the garage with the door open, drinking together. (Tr. at 292-93, 297, 300-01.) While smoking, S.A. noticed there seemed to be a great deal of beer and asked his father why he was

spending so much of his mother's money on alcohol. (Tr. at 300.) His father did not respond to this inquiry, merely gave him a blank stare and sipped his beer. (Tr. at 301-02.)

{¶ 10} S.A. turned back to his friends and, at that point, heard his father telling Carney repeatedly to put his knife away. (Tr. at 302-03.) S.A. said he turned back and asked Carney why he had a knife out. (Tr. at 303.) He also asked his friends if they would help him against Carney if Carney were to attack him and both friends said they would. (Tr. at 304.) According to S.A., Carney then stood up and "went across my back." *Id.* In response to that knife attack, S.A. said he punched Carney. *Id.* S.A. said when he punched Carney, Carney fell back but that he kept hitting Carney and Carney kept stabbing him. (Tr. at 306-07.) S.A. said his girlfriend got the knife away from Carney in the scuffle but that Carney continued to attack him even without the knife. (Tr. at 308.) S.A. claimed not to have said anything to Carney in the garage to provoke the fight and related that he and Carney had only met once before. (Tr. at 312, 316-17.)

{¶ 11} S.A. said that he was ultimately stabbed four times. (Tr. at 314.) He received staples and stitches as treatment and was in the hospital for three days. (Tr. at 313-14.) He described the injuries as the worst pain he had ever felt and stated that he still has scars from the incident. (Tr. at 313-15.)

{¶ 12} On cross-examination, S.A. admitted that Carney was sitting when the fight began and that Carney had to get part of the way out of his seat in order to stab him. (Tr. at 319.) S.A. said he did not leave the area before the attack because, once Carney had the knife out, he was worried about being stabbed in the back. (Tr. at 320.) He admitted that he may have told an interviewer at the hospital that he hit Carney first and that Carney responded by stabbing him. (Tr. at 323.) But he said he misspoke and was under the influence of trauma and drugs. (Tr. at 324.) He admitted that he might also have told hospital staff that he was a gang member who sold drugs and had been shot at. (Tr. at 329-31.) However, he said he had lied in an effort to seem "cool" while under the influence of pain killers. *Id.* He said he was still in a relationship with the same girlfriend who was to testify in the case, but they had never spoken about the incident or their testimony. (Tr. at 324-26.) S.A. acknowledged that he sometimes had gotten in physical fights with his father and that, after this incident, his father left the country and S.A. never saw him again. (Tr. at 317, 327-28.)

{¶ 13} S.A.'s girlfriend testified next. She testified that on May 1, 2017, she, S.A., and two male friends were socializing when they decided to leave the house to smoke marijuana. (Tr. at 337.) They encountered Carney and S.A.'s father sitting drinking near the garage. (Tr. at 338.) She said S.A. questioned his father about why he was spending all the money on alcohol. (Tr. at 338-39.) Nobody responded to S.A.'s questioning, but Carney put his hand down in his lap area and S.A.'s father asked him what he was doing and told him to put the knife away. (Tr. at 339.) S.A.'s girlfriend testified that Carney rose to his feet and stabbed at S.A., who was standing diagonally to Carney. (Tr. at 340.) She related that Carney stabbed as he stood up but was not sure exactly how Carney managed to stab S.A. in the place that he did. (Tr. at 341.) She grabbed the knife from Carney when they fell to the ground in the tussle. (Tr. at 342-43.) She said S.A. was stabbed four times and received stitches and staples to treat the wounds. (Tr. at 341-42, 345.)

{¶ 14} On cross-examination, S.A.'s girlfriend admitted that she told the detective who interviewed her at the scene that S.A. ran at Carney while Carney sat in the lawn chair but said she was frantic at the time and did not mean what she said. (Tr. at 348.) She also admitted (after some apparent reluctance and after seeing a video of her interview) that she told the detective at the scene that S.A. walked over to Carney, who was sitting, and "punched him so hard in the face" which set off the incident in which Carney "whipped a knife out." (Tr. at 349-58.) However, she insisted that her account at the scene was a misspoken comment. (Tr. at 350, 358-59.) She denied ever having discussed the events or her testimony with her boyfriend, S.A. (Tr. at 359-61.)

{¶ 15} On redirect, she testified to a written statement she had given to the detective whereby she indicated that S.A. only ran at Carney because Carney pulled a knife out on him. (Tr. at 362-63.) She said that her written statement indicated that Carney sliced S.A.'s back as S.A. was attempting to throw a punch. *Id.* She reiterated, however, that her testimony at the trial was that Carney stabbed S.A. before S.A. hit him. (Tr. at 363-64.)

{¶ 16} S.A.'s mother also testified, confirming who was present in the house and recounting how she ran out in the backyard when she heard screaming and saw S.A. standing with a "big hole in his back, bleeding." (Tr. at 366-70.) She confirmed that Carney was a friend of her husband's, who had been at the house perhaps ten times. (Tr. at 367.) She testified that she, as a trained R.N., put pressure on the back wound with a clean towel

and that S.A. telephoned the police himself.  (Tr. at 367, 373.)  She confirmed that S.A. was in the hospital for three days as a result of his wounds.  (Tr. at 374.)

{¶ 17}  The final witness to testify, and the only witness to testify for the defense, was Carney.  (Tr. at 386.)  Carney agreed that, at the time of the incident on May 1, 2017, he was 46 and S.A. was 15.  (Tr. at 386, 407.)  He said that S.A.'s father had picked him up earlier that day and brought him over to look over some drywall repair work in the basement of the house at South Roosevelt Avenue.  (Tr. at 387-88.)  After he viewed the site for the potential repair work, S.A.'s father invited him to sit and have a couple of beers and talk about the potential drywall repair job.  (Tr. at 388.)  They each sat in a chair in the garage and had been there approximately one and one-half hours drinking when S.A. and his three teenage friends arrived.  (Tr. at 389, 391-92.)  At that point, he testified, he had consumed four beers.  (Tr. at 389-90.)  He was carrying his pocket knife, which he always did in connection with his trade as a carpenter.  *Id.*  He stated that he had met S.A. once before and had no animosity toward him.  (Tr. at 391.)

{¶ 18}  He said that S.A. began to argue with his father over whether he and his friends could smoke marijuana in the garage and why S.A.'s father was drinking in the garage.  (Tr. at 392-93.)  At the time of this argument, S.A. and his friends were arrayed in front of where the two men were seated.  (Tr. at 392.)  Carney testified that he was aware that S.A. was prone to violence and had physically attacked his father on several occasions.  (Tr. at 393-94.)  He said the argument escalated and S.A. got close to his father, yelling in his face and pointing his finger at his face.  (Tr. at 394.)  So Carney took out his knife, opened it, and held it at his side by his right hip.  (Tr. at 395.)  He denied waving it or making overtly threatening gestures.  (Tr. at 396.)  However, he testified that the next thing he knew he was on the ground, S.A. having punched him in the face, knocking him from the chair, and that S.A. was continuing to beat his face.  *Id.*  He said he used the knife only to get S.A. off of him and protect himself from harm.  (Tr. at 396-97.)

{¶ 19}  After the fight, S.A.'s father drove Carney home.  (Tr. at 397-98.)  Carney cleaned the blood from his face and head and threw his clothes in the laundry.  (Tr. at 398.)  Carney testified that he had no thought that the clothes might be needed as evidence because he viewed the interaction as self-defense and had no idea at that point how badly he had hurt S.A.  (Tr. at 398-99.)  He testified that, to calm his nerves, he drank

approximately six more beers.  (Tr. at 399.)  He stated that he anticipated that the police might want to come interview him about the incident but that he never thought he would be arrested or charged.  (Tr. at 401.)

{¶ 20}  On cross-examination, Carney agreed that, although S.A. was not talking to him, he was talking about him and pointing at him.  (Tr. at 403.)  Carney agreed that S.A.'s father told Carney to put down the knife.  (Tr. at 404.)  Carney agreed that he stabbed S.A. four times.  (Tr. at 403.)  Carney confirmed that he left the scene with S.A.'s father before the police arrived and that he did not call the police to report that S.A. had attacked him. (Tr. at 404-06.)  Carney agreed that when the police arrived at his house, he asked the officers something to the effect of "[w]hat took you so long to get here?"  (Tr. at 406.)  But he also indicated that he voluntarily told them where the bloody clothes were.  *Id.*

{¶ 21}  Carney's counsel made and renewed Criminal Rule 29 motions during the trial which the trial court denied.  (Tr. at 383-84, 411.)  After deliberating, the jury found Carney guilty of both counts of the indictment.  (Tr. at 483-85.)  The trial court sentenced Carney to serve two years in prison for the felonious assault with a concurrent term of one year for the offense of tampering with evidence.  (Tr. at 497; May 29, 2019 Jgmt. Entry at 1.)

{¶ 22}  Carney now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 23}  Carney presents two assignments of error for review:

> [1.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM. R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.
>
> [2.] THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  DISCUSSION

### A.  First and Second Assignments of Error – Whether Carney's Convictions were Against the Manifest Weight of the Evidence and Whether they were Insufficiently Supported by the Evidence such that a Criminal Rule 29 Motion should have been Granted

{¶ 24}  In his first assignment of error, Carney argues that both his convictions were insufficiently supported and that the trial court should have granted a motion under Crim.R. 29, dismissing the case for insufficient evidence.  (Carney's Brief at 13-20.)  In his second assignment of error, Carney argues that his conviction for felonious assault was against the manifest weight of the evidence.  *Id.* at 20-24.  Despite the distinct differences in the standards of analysis between these two issues for review on appeal, they share some commonality, and we address them together to avoid restating matters in common to both.

{¶ 25}  The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' "  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990).  In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony."  *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 26}  In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the

> evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 27} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *Thompkins* at 386. Thus, when reviewing the record for sufficiency of evidence, we also address Carney's arguments relating to Crim.R. 29 motions at trial using the same standard.

### 1. Felonious Assault

{¶ 28} The Ohio Revised Code defines felonious assault as follows:

> (A) No person shall knowingly do either of the following:
>
> (1) Cause serious physical harm to another * * *;
>
> (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon* * * .

R.C. 2903.11(A). " 'Deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). " 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

> "Serious physical harm to persons" means any of the following:
>
> * * *
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

**{¶ 29}** There is no dispute that Carney used a knife to stab S.A. repeatedly with the result that he caused at least "physical harm" to S.A. and can also be found to have caused him "serious physical harm." *Compare* R.C. 2901.01(A)(3) *with* R.C. 2901.01(A)(5). It is also clear that the knife was a "deadly weapon" because it was capable (by its nature as a knife) of inflicting death and was, in this case, "used as a weapon." R.C. 2923.11(A). Carney's testimony was perfectly frank about the fact that he knowingly stabbed S.A. with the knife, and the record contains no dispute regarding the testimony on the significant nature of the cuts inflicted, particularly to S.A.'s back. (Tr. at 175-76, 205-07, 250-51, 374, 403.) Thus, leaving aside for a moment the issue of self-defense, the evidence in the record clearly indicates that Carney committed felonious assault when he knowingly stabbed and slashed S.A. repeatedly with a knife with the result that S.A. received significant wounds and required several days of treatment in the hospital. *Id.*; R.C. 2903.11(A)(1) and (2).

**{¶ 30}** However, a significant feature in this case was the issue of self-defense. Both we and the Supreme Court have previously explained that the elements of self-defense in a deadly force case are that the defendant (1) was not at fault in creating the situation giving rise to the affray, (2) that the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was the use of such force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Howard*, 10th Dist. No. 16AP-226, 2017-Ohio-8742, ¶ 22. Consistent with the self-defense requirement that force must be the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack. *Howard* at ¶ 22, citing *State v. Jones*, 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 27; *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25; *State v. Williford*, 49 Ohio St.3d 247, 250 (1990); *State v. Thomas*, 77 Ohio St.3d 323, 329-30 (1997).

**{¶ 31}** In the past, the elements of self-defense were for the defendant to establish by a preponderance of the evidence. *See, e.g.*, *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). But, revisions to the law enacted shortly before the trial of this case have placed the burden

on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt.    R.C. 2901.05(B)(1); 2019 Am.Sub.H.B. No. 228.[2] That is, R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

In other words, in this case, the prosecution was required to disprove self-defense by proving beyond a reasonable doubt that Carney (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.  *See* R.C. 2901.05(B)(1); *Robbins* at paragraph two of the syllabus.

{¶ 32} Both S.A. and his girlfriend testified that Carney was the first to strike. *See supra* at ¶ 10, 12-15.  Although both gave conflicting reports shortly after the stabbing, which were used to impeach their credibility, under the sufficiency standard and viewing the evidence in the light most favorable to the State, we assume the credibility of their assertion that Carney struck first. *Monroe*, 2005-Ohio-2282, at ¶ 47.  Under that version of events, the State disproved self-defense.

{¶ 33} Turning to the manifest weight standard, where we "sit[] as a 'thirteenth juror' and disagree[] with the jury's resolution of the conflicting testimony," we recognize that, regardless of who was the initial physical aggressor in this case, the evidence was extremely thin on the question of why Carney and S.A. fought at all. *Thompkins*, 78 Ohio St.3d at 388, quoting *Tibbs*, 457 U.S. at 42.  They essentially did not know each other and said little to nothing to each other before engaging physically.  *See supra* at ¶ 10, 17-18.  Thus, it would be difficult to say that the State proved, beyond a reasonable doubt, that Carney was at fault in creating the situation giving rise to the affray.  However, we need not

---

[2] Archived online at 2017 Ohio HB 228.

definitively settle that issue because there is a second and alternative element of proof that may be examined.

{¶ 34} Even if S.A. attacked first and punched Carney in the face, it is difficult to find that this 46-year-old carpenter, armed with a knife in hand, held a bona fide belief that he was in imminent danger of death or great bodily harm from an unarmed 15-year-old (albeit supported by his teenage friends), such that the use of deadly force was his only means of escape. We do not imply that no juror could have believed that Carney held such a bona fide fear or belief. But we must review the entire record, weigh the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, which we have done in our review. Accordingly, we cannot reach the conclusion that the jury clearly lost its way and created a manifest miscarriage of justice. We are able to determine from our review that the jury could have found that the prosecution had proved Carney was not genuinely in fear for his life when he lashed out at S.A. with a knife. *Thompkins* at 387.

{¶ 35} From a sufficiency of evidence standpoint on the prosecution's recent statutory duty to disprove one of the elements of self-defense, we further find that, "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found" that the prosecution disproved at least one of the "essential elements" of self-defense "beyond a reasonable doubt." (Citations and quotation marks omitted.) *Monroe*, 2005-Ohio-2282, at ¶ 47. We overrule Carney's first and second assignments of error as to the felonious assault offense.

### 2. Tampering with Evidence

{¶ 36} The Ohio Revised Code defines the offense of tampering with evidence in relevant part as follows:

> (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
>
> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

R.C. 2921.12(A)(1). There is no dispute in this case that after the incident, Carney washed the blood from his face and laundered the clothes he had been wearing when he stabbed

S.A. (Tr. at 216-17, 406.) The relevant questions to the offense of tampering with evidence are whether he knew that an official investigation was in progress or likely to be instituted and whether he acted with purpose to impair the value of the bloodstained clothes as evidence.

{¶ 37} Both the officer who arrested Carney, and Carney himself, testified that Carney remarked something to the effect of, "I'm surprised it took you so long to come to my house," and expressed that he had been waiting for the police. (Tr. at 263, 401, 406.) This could be taken by a jury to be an indication of Carney's recognition that the police would find a stabbing incident involving a 46-year-old man stabbing a 15-year-old boy in front of four witnesses significant enough to investigate. Even though Carney testified that he never thought he would be arrested or charged, the evidence supports that he recognized that an official investigation was likely to be instituted or in progress. (Tr. at 401.)

{¶ 38} The question of whether Carney acted with purpose to impair the value of the bloodstained clothing as evidence is a closer one. R.C. 2921.12(A)(1). However, in a sufficiency analysis, drawing all inferences in favor of the State, the facts speak for themselves. That is, Carney (a 46-year-old) stabbed S.A. (a 15-year-old) and, on returning home, laundered the bloody clothes despite his confessed expectation that the police would soon arrive and, at a minimum, want to talk to him about what happened. (Tr. at 216-17, 263, 386, 398, 401, 406-407.) Under the facts, it could be inferred that Carney was seeking to destroy evidence of his involvement in the altercation. *Monroe*, 2005-Ohio-2282, at ¶ 47. Thus, "viewing the evidence in a light most favorable to the prosecution," we find that a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations and quotation marks omitted.) *Id.*

{¶ 39} In a manifest weight analysis, where we are not required to draw inferences in favor of the State and are instead called upon to "sit[] as a 'thirteenth juror' and disagree[] with the jury's resolution of the conflicting testimony," the analysis conceivably might be different. *Thompkins*, 78 Ohio St.3d at 388, quoting *Tibbs*, 457 U.S. at 42. But Carney does not argue on appeal that his conviction for tampering was against the manifest weight of the evidence. (Carney's Brief at 22-24.) Consequently, we do not address that issue.

**{¶ 40}** Because the evidence was sufficient to convict Carney of tampering with evidence, we overrule his first assignment of error as it relates to his conviction for tampering.

## IV. CONCLUSION

**{¶ 41}** Carney's conviction for felonious assault was sufficiently supported and not against the manifest weight of the evidence where, despite a dispute in the record about who struck the first blow in the fight, he, a 46-year-old intoxicated carpenter, repeatedly stabbed an unarmed 15-year-old boy. Carney's conviction for tampering with evidence was supported by sufficient evidence because, viewing the evidence in a light most favorable to the prosecution, it is reasonable to infer that Carney's decision to wash his bloody clothing was made with purpose to impair its use as evidence. We overrule both of Carney's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and NELSON, JJ., concur.