[Cite as *State v. James*, 2024-Ohio-621.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-12-091 |
| | : | O P I N I O N |
| - vs - | | 2/20/2024 |
| | : | |
| CHAD A. JAMES, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2021 CR 0801

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Gary A. Rosenhoffer and R. Scott Croswell, for appellant.

**HENDRICKSON, J.**

{¶ 1}   Appellant, Chad James, appeals from his conviction in the Clermont County Court of Common Pleas for aggravated menacing.  For the reasons set forth below, we affirm appellant's conviction.

{¶ 2}   In September 2021, appellant was indicted on two counts of felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2); one count of abduction

in violation of R.C. 2905.02(A)(2); and one count of kidnapping in violation of R.C. 2905.01(A). Each of the foregoing four counts were accompanied by a firearm specification, body armor specification, and forfeiture specification. Appellant was also indicted on two counts of aggravated menacing in violation of R.C. 2903.21(A).

{¶ 3} The charges of the indictment stemmed from an encounter that occurred between appellant, Lucy, and her mother, Rachel, during which appellant confronted Lucy and Rachel in his yard while wearing a bullet proof vest and wielding a firearm. The incident occurred around 10:00 p.m. on August 10, 2021, when Lucy, who is autistic and was 12 years old at the time, uninvitedly entered appellant's yard while she and Rachel were canvassing the neighborhood for a missing dog.[1] Appellant pled not guilty to the charges and the matter proceeded to a bench trial on September 26, 2022.

{¶ 4} At trial, the state presented testimony from several witnesses, including Lucy, Rachel, Lucy's nanny at the time of the incident, appellant's neighbor, and various law enforcement officers with the Goshen Township Police Department and the Clermont County Sheriff's Office. The testimony at trial revealed that on August 10, 2021, Rachel, Lucy, Lucy's nanny, and Lucy's two sisters were searching for their neighbor's missing dog, Ryder. That night, Rachel and the others were looking for Ryder while driving along State Route 48, also known as Oakland Road, in Rachel's white SUV. Rachel searched this specific area of State Route 48 because Ryder had been spotted in the vicinity earlier that day.

{¶ 5} At approximately 9:50 p.m., Rachel heard a dog barking near a home located at 6694 Oakland Road in Loveland, Ohio. Rachel, who did not know the homeowner, pulled into the home's driveway, intending to ask if the homeowner had seen

---

1. For privacy and readability, we refer to the minor victim using a fictitious name.

Ryder. After exiting her vehicle, Rachel knocked on the front door while the others remained in her vehicle with the windows down.

{¶ 6} The home at 6694 Oakland Road belonged to Tammy Taylor, appellant's next-door neighbor. At the time of the incident, Taylor lived in the home with her husband, three children, and Jada, her son's girlfriend. Taylor testified she does not open the door for people she does not know, as Jada's mother, in addition to those associated with her, had caused trouble at Taylor's house in the past. According to Taylor, Jada's mother was involved in drug related activity, and there had been instances where she and her associates had attempted to remove Jada from Taylor's home, resulting in police involvement. Due to these encounters with Jada's mother, Taylor did not answer the door when she realized neither she nor her son recognized Rachel.

{¶ 7} Although Taylor did not answer the door or otherwise acknowledge Rachel, Rachel continued knocking. After a few minutes, appellant's girlfriend, Heather McClin, inquired about the situation by text-messaging Taylor.[2] McClin and appellant live next-door to Taylor at 6688 Oakland Road and were aware of Taylor's previous encounters with Jada's mother. Due to the proximity of their homes, McClin and appellant could see Taylor's driveway from the front window of their home. On the night of the incident, appellant and McClin observed Rachel pull into Taylor's driveway, where she remained for some time. When McClin learned that Taylor did not recognize the woman and that the woman would not leave, she offered to have appellant come over to Taylor's "with a gun."

{¶ 8} After knocking on Taylor's door for approximately five minutes, Rachel and the others in her vehicle observed a headlight in a driveway near appellant's home. Lucy,

---

2. A copy of McClin and Taylor's text messages were admitted as an exhibit at trial.

who was still in the car at that time, asked Rachel if she could go to the driver and ask if he had seen Ryder. Although Rachel was reluctant to allow Lucy to go next door after dark, Lucy was persistent. Ultimately, Rachel permitted Lucy to go next door, but directed Lucy to "make sure [she was] loud," "make sure [she was] waving [her] arms" and "yelling excuse me." Rachel cautioned Lucy that it was dark and that she could scare someone.

{¶ 9} At that point, Lucy "slowly jogged" across the yard of Taylor's home toward the location of the headlight. According to Lucy, she followed her mother's orders, and loudly announced her presence while jogging. After jogging five steps in the direction of the headlight, Lucy encountered appellant in the yard. Lucy was close enough to Taylor's house that her nanny, who remained in Rachel's vehicle, and Rachel, who remained at Taylor's front door, observed the entire encounter.

{¶ 10} On the night of the incident, Lucy had braces and was wearing a colorful outfit with a bucket hat and her hair in pigtails. When appellant approached Lucy in the yard, he shined a flashlight in her face and ordered her to show him her hands and face, and to get on her knees. Although it was dark, Lucy could discern that appellant was a man given the "bolder," "bigger," and "tougher" figuring of his body. Appellant continued to yell at Lucy, asking who she was and what she was doing, and ordered her to remove her hat. Lucy tried to answer appellant's questions, but he told her to "shut the fuck up" and stated that "if [she] didn't tell him who [she] was or what [she] was doing[,] he would shoot [her] in the fucking face."

{¶ 11} Although Lucy told appellant she was just a kid, appellant "didn't care." Lucy testified she followed appellant's commands, and while on her knees removing her hat, she noticed appellant had a firearm. Lucy believed appellant would shoot her if she did not comply, and was very scared, nervous, and anxious during their encounter.

{¶ 12} When Lucy encountered appellant, Rachel was still standing at Taylor's

front door. According to Rachel, Lucy made it four or five steps before she was met with a flashlight in her face and a man's voice accusing her of "snooping" around his home and screaming at her to "get on the ground." Rachel heard appellant order Lucy to get on the ground, put her hands behind her head, and to get on her hands and knees. At that point, Rachel could tell that Lucy was scared, but it was not until Rachel heard appellant threaten to shoot Lucy "in her fucking face" that Rachel left Taylor's front door and confronted appellant by yelling "fuck no you won't," "she's 12 years old."

{¶ 13} As Rachel walked toward appellant, he shined the flashlight in her direction and told her "he would shoot her as well." At that time, Rachel noticed the handgun appellant was pointing at her, and she "really started to freak out." Rachel's adrenaline "kicked in" and she began screaming at appellant that Lucy was a child, and that they were looking for a neighbor's dog. Rachel stated she argued with appellant, calling him "every name in the book," in an attempt to divert his attention away from Lucy. Appellant and Rachel continued arguing for one to two minutes. During that time, appellant "yelled at [Lucy] again to stay on [her] knees" and told Lucy he would shoot her if she got off the ground. Eventually, appellant allowed Lucy to go to the car, while he and Rachel continued arguing. When Lucy returned to the vehicle she was hyperventilating, crying, and terrified. A few minutes later, appellant allowed Rachel to leave but kept his firearm pointed at her until she reached her vehicle.

{¶ 14} According to the state's witnesses, the encounter between Lucy, Rachel, and appellant lasted between three and five minutes. During that time, Rachel heard appellant threaten to shoot Lucy three separate times.

{¶ 15} After the incident, Rachel called 911 and spoke with officers at her home that evening. Approximately one week later, officers arrested appellant at his home. Prior to his arrest, appellant provided his version of the story, which was recorded, played at

trial, and admitted into evidence. During his statement, appellant claimed a vehicle pulled into his driveway around 10 or 11 p.m., and then left to pull into Taylor's driveway next-door. At that point, a person exited the vehicle and began knocking on Taylor's door. Appellant then saw individuals walk toward the rear side of his home near his kids' bedroom windows. Appellant came outside to ask who they were, and realized someone was running towards him. He claimed Rachel did not say Lucy was a 12-year-old girl, but Lucy put her hands up and said "hey, I'm just looking for my dog." After he realized who they were and confirmed they were not a threat, he "backed off" and let them leave.

{¶ 16} After appellant's arrest, Detective Stephen Maynard with the Goshen Township Police Department executed a search warrant of appellant's home, looking for ballistic vests, firearms, and ammunition. On cross-examination, the detective discussed his process of assessing individuals for a threat. The detective explained that in determining if someone is a threat, it is common to ask to see the individual's hands; to watch for furtive movements; and to see if the person is dressed in a way that could conceal a weapon. According to the detective, if he encountered an individual running at him in the middle of the night, he might feel in fear of being harmed, and would feel it necessary to identify if there was a threat. The detective testified that under similar circumstances, it would "not be out of line" to carry a weapon and wear a ballistic vest when assessing the threat. However, after determining there was no threat and that there was no weapon, the detective testified he would have deescalated the situation and would not have continued to hold the person at gunpoint for multiple minutes.

{¶ 17} Appellant and McClin testified in appellant's defense. Appellant testified that he was acting in self-defense during the encounter with Lucy in the yard. Appellant served in the United States Marine Corps for four years, during which he was deployed to Afghanistan twice. During his deployments, appellant experienced extensive combat

and was trained in threat assessment. This training included ensuring he had positive identification before engaging a target, searching individuals, and seeing their hands. After being honorably discharged from the military in 2011, appellant attended security schooling and transitioned to employment in private security. During this transition, appellant received additional threat assessment training, including how to read body language and to look for "hands, showing face, everything."

{¶ 18} Appellant then recited his version of the events on August 10, 2021, and testified that he observed a vehicle pull into his driveway. From his front window, appellant watched the vehicle exit his driveway and pull into his neighbor's, Taylor's, driveway. The vehicle remained in Taylor's driveway "for a while," prompting the text-messages from appellant's girlfriend, McClin, to Taylor. At that point, McClin asked appellant if he was going to "see what's going on," to which appellant responded affirmatively. Appellant grabbed his flashlight, threw "a vest" on underneath his t-shirt, and holstered a firearm before going out his front door.

{¶ 19} After entering his front yard, appellant encountered someone that appeared to be 18 to 20 years old running from the direction of Taylor's home. Appellant did not know who the person was and believed the individual was "coming to do some type of harm towards [him.]" As a result, appellant said, "Let me see your hands. Show me your face. Stop running at me." The individual, later identified as Lucy, eventually put her hands up and appellant "could see" her. Appellant did not recall stating "stop or I'll shoot," but acknowledged he may have said something like, "I have a gun. I'll shoot." Appellant denied ordering Lucy to her knees or to stay on the ground, but instead claimed that, after establishing Lucy was a child with no weapon, he told her, "you can go to your knees" as she was "wilting down." Appellant claimed his interaction with Lucy lasted approximately 3 to 5 seconds before Rachel started yelling from Taylor's home.

{¶ 20} Appellant testified when he initially encountered Lucy running towards him, he felt threatened for his safety, but as soon as he identified her as a 12-year-old girl, and that Rachel was her mother, he let Lucy go. Rachel, however, continued to debate with appellant about whether she could search the yard for a missing dog. Appellant claimed he tried to deescalate the situation with Rachel by telling her to leave, but she continued to "ramp it up" by yelling.

{¶ 21} Appellant further testified that he felt Lucy was a "pretty high threat" when she ran at him unannounced in the dark. When asked to clarify that a 12-year-old girl posed a very high threat to him, appellant explained that, in his experience in Afghanistan and Iraq, 12-year-olds could carry dangerous weapons.

{¶ 22} After considering the evidence presented before it, the trial court found appellant guilty of two counts of aggravated menacing and not guilty of the remaining counts of the indictment. Regarding the felonious assault charges, the court noted that, "[it] must find that" "[appellant] knowingly cause[d] or attempt[ed] to cause physical harm in this case" when he "held a child and her mother at gunpoint, threatening to harm them[,]" "[k]nowing that if he shot them they could suffer serious physical harm." In analyzing appellant's self-defense claim, the court concluded that appellant was acting in self-defense at the time the alleged felonious assault occurred, and that the state "failed to meet its burden of proving that any of the three elements of self-defense were missing." However, the trial court concluded self-defense did not apply to the aggravated menacing charges, because appellant "continued to make verbal threats that he would use the gun[,]" although "the threat was neutralized." Thus, the court concluded that appellant was no longer acting in self-defense once Lucy was on the ground and the threat had been neutralized. As a result, the court found appellant guilty of both counts of aggravated menacing.

{¶ 23} The trial court sentenced appellant to one year of community control.[3] Appellant now appeals his conviction, raising the following assignments of error, which we will combine, in part, for the ease of discussion.

{¶ 24} Assignment of Error No. 1:

{¶ 25} AS A MATTER OF LAW, THE TRIAL COURT ERRED IN CONVICTING APPELLANT JAMES (JAMES) OF AGGRAVATED MENACING AS THE DEFENSE OF SELF-DEFENSE WAS APPLICABLE TO ALL CHARGES.

{¶ 26} In his first assignment of error, appellant argues the trial court erred in finding that self-defense did not apply to the aggravated menacing charges. On appeal, appellant claims that, because the trial court concluded that self-defense was a defense to the felonious assault charges, it should have found that self-defense was a "complete defense" to the lesser offense of aggravated menacing.

{¶ 27} Traditionally, self-defense has been an affirmative defense which an accused must prove by a preponderance of the evidence. *State v. Gesell*, 12th Dist. Butler No. CA2005-08-367, 2006-Ohio-3621, ¶ 47. However, effective March 28, 2019, the General Assembly amended Ohio's self-defense statute, R.C. 2901.05, to place the burden of proof on the state to prove beyond a reasonable doubt that the accused did not act in self-defense. R.C. 2901.05(B)(1). The amended statute shifts the burden of proof on the affirmative defense of self-defense from the defendant to the prosecution, provided that "there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence." *Id.* The state satisfies its burden if it disproves at least one of the elements of self-defense beyond

---

3. Preliminarily, we note that although appellant has completed his sentence, this appeal is not thereby rendered moot. *See Cleveland Hts. v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, ¶ 23; *State v. Glisson*, 12th Dist. Clermont No. CA2020-11-064, 2021-Ohio-1985, ¶ 12.

a reasonable doubt. *State v. McFarland,* 12th Dist. Butler No. CA2021-05-053, 2022-Ohio-2326, ¶ 43.

{¶ 28} An accused is justified in the use of force against another if (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Regarding the duty to retreat, a person has no duty to retreat before using force in self-defense if that person is in a place in which the person lawfully has a right to be. R.C. 2901.09(B).

{¶ 29} "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal[.]" *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 27; *see also State v. Cody*, 12th Dist. Clinton No. CA2023-05-010, 2023-Ohio-4781, ¶ 10. In evaluating a manifest weight challenge involving self-defense, we must review the entire record, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the state disproved at least one of the elements of self-defense beyond a reasonable doubt. *State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 287 (1997).

{¶ 30} Here, appellant introduced evidence that tended to support that he acted in self-defense when he threatened Lucy and Rachel in his yard with a firearm. As a result, the burden shifted to the state to disprove self-defense by establishing beyond a reasonable doubt that appellant: (1) was at fault in creating the situation giving rise to the affray; or (2) did not have reasonable grounds to believe or an honest belief that he was

in imminent danger of bodily harm; or (3) violated a duty to retreat or avoid the danger. *McFarland* at ¶ 43; *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

{¶ 31} After our review of the entire record, we conclude the trial court did not clearly lose its way or create a manifest miscarriage of justice when it found the state had proven beyond a reasonable doubt that appellant did not act in self-defense when he committed aggravated menacing against Lucy and Rachel. Because it is dispositive of appellant's self-defense claim, we will begin our analysis with the second element of self-defense, i.e., whether appellant had a bona fide belief that he faced imminent danger of death or great bodily harm from either Lucy or Rachel after he discovered Lucy's identity. This element of self-defense is a combined subjective and objective test. *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). The trier of fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack [he] *reasonably* believed [he] was in imminent danger." (Emphasis sic.) *Id.* "Then, if the objective standard is met, the [trier of fact] must determine if, subjectively, this particular defendant had an honest belief that [he] was in imminent danger." (Emphasis sic.) *Id.* at 331.

{¶ 32} At trial, appellant testified that he felt threatened when he left his home and was immediately confronted by someone running towards him in the middle of the night. At that point, he was unsure if the person had a weapon, was unsure of their motive or purpose for running near his home, and believed the person intended to harm him. Thus, because the situation unfolded quickly, appellant argues self-defense should have applied to all his actions that evening, not just the initial confrontation.

{¶ 33} As an initial note, appellant's argument relies solely upon his testimony that

his interaction with Lucy lasted less than a minute before Rachel became involved, and that he immediately holstered his weapon and let Lucy return to her mother. However, this argument completely ignores testimony from the state's witnesses that the entire incident lasted between three and five minutes and that appellant's threats continued after he discerned that Lucy was a child who posed no threat. In light of its verdict, the trial court clearly found the state's version of events as presented by Lucy, her nanny, and Rachel more credible than appellant's version. As the trier of fact, the trial court was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations to judge the credibility of witnesses and the weight to be given the evidence. *State v. Clemmons*, 12th Dist. Butler No. CA2020-01-004, 2020-Ohio-5394, 2020-Ohio-5394 at ¶ 24. Thus, despite appellant's testimony at trial, the trial court's rejection of his self-defense claim is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the state. *See State v. Himes*, 12th Dist. Butler No. CA2023-03-030, 2023-Ohio-3561, ¶ 27.

{¶ 34} Additionally, even if appellant believed the situation occurred quickly, the record establishes that after the initial confrontation, appellant knew neither Lucy nor Rachel posed any threat. Although appellant could not immediately identify Lucy's characteristics, the comments from Lucy and Rachel, in addition to Lucy's appearance and demeanor, should have alerted him to her non-threatening nature. This is especially true given appellant's status as a Marine extensively trained in threat assessment, as well as his use of a flashlight to instantly illuminate Lucy, who was wearing colorful clothing and had braces and pigtails the night of the incident. The record also reflects Lucy was compliant, very scared, and "wilted" to the ground during the incident.

{¶ 35} Appellant's testimony suggests he assessed Lucy as a nonthreat in less than one minute. Despite his trained assessment of Lucy, during which appellant would

have observed the above, appellant continued to hold Lucy at gunpoint for multiple minutes while he argued with her mother. In light of this evidence, we find the record reflects that, after his initial confrontation of Lucy in the yard, appellant did not reasonably or honestly believe he was in imminent danger, and therefore, he was not using "defensive force" when the situation progressed beyond that point.

{¶ 36} We also disagree with appellant that, because Lucy and Rachel were trespassers, they cannot be "turned into victims by their illegal status." Instead, even if Lucy and Rachel were on appellant's property without permission does not necessarily indicate he reasonably felt any threat of imminent danger or was justified in his use of force. *See, e.g., State v. Anthony*, 11th Dist. Ashtabula No. 2019-A-0064, 2020-Ohio-861, ¶ 19-21 (rejecting the appellant's self-defense claim where he used non-deadly force against an uninvited-individual who approached the appellant in his yard at night). Rather, it is evident that any threat of imminent danger had dissipated after appellant's initial confrontation of Lucy. As such, under the circumstances of this case, the altercation appellant sought to defend against ceased when he discovered that Lucy was a young girl, searching for a lost dog.

{¶ 37} Lastly, we reject appellant's argument that the trial court's decision is against the manifest weight of the evidence because it failed to cite R.C. 2901.09(B) when rejecting part of appellant's self-defense claim. R.C. 2901.09(B), which is considered part of the "castle doctrine," states:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.

{¶ 38} Based upon this part of the castle doctrine, appellant essentially argues that R.C. 2901.09(B) provides a complete defense of self-defense when force is used in a

place the person is lawfully permitted to be. After our review, we do not find the plain language of R.C. 2901.09(B) to be so broad. That is, although the statute cited by appellant creates an exception to the third element of self-defense, the duty to retreat, it does not negate the remaining elements of self-defense. Notably, appellant cites no case law to support his proposition, and this court could find none. Instead, other courts have determined that "the castle doctrine" is clearly one part of the self-defense body of law, and while it provides a defendant confronted with an intruder in certain locations with somewhat greater protections under the law, it does not serve as a stand-alone right to use force absent other elements of self-defense. *State v. Carosiello*, 7th Dist. Columbiana No. 15CO0017, 2017-Ohio-8160, ¶ 22; *see also State v. Montgomery*, 12th Dist. Clermont No. CA2015-03-028, 2015-Ohio-028, ¶ 15-17. Consequently, even if appellant did not violate any duty to retreat pursuant to R.C. 2901.09(B), appellant's self-defense claim still fails where there is credible evidence that he did not have an honest or reasonable belief that he was in imminent danger.[4]

**{¶ 39}** In light of the foregoing, we find the factfinder could reasonably believe that, while appellant was initially justified in threatening Lucy with a firearm in his yard, his actions were no longer justified after the initial threat was neutralized and he learned that Lucy was not a threat. *See State v. Gilcrease*, 8th Dist. Cuyahoga No. 108148, 2020-Ohio-487, ¶ 75. Accordingly, the trial court's conclusion that the state proved beyond a reasonable doubt that appellant did not act in self-defense for the entirety of the encounter is not against the manifest weight of the evidence.

**{¶ 40}** Appellant's first assignment of error is overruled.

---

4. For similar reasons, we find the supplemental authority provide by appellant, i.e., *State v. Robertson*, 1st Dist. Hamilton No. C-220047, 2023-Ohio-2602, to be unpersuasive and distinguishable from the facts presented in this case.

{¶ 41} Assignment of Error No. 2:

{¶ 42} THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT CONCLUDED THAT APPELLANT JAMES (JAMES) HAD NOT FORMED A SPECIFIC INTENT TO COMMIT AN OFFENSE SUPERIOR TO AGGRAVATED MENACING AND THEN CONVICTED JAMES OF THE INFERIOR OFFENSE.

{¶ 43} Assignment of Error No. 3:

{¶ 44} THE TRIAL COURT'S FINDING OF GUILT AS TO AGGRAVATED MENACING WAS AGAINST THE MANIFEST EIGHT OF THE EVIDENCE.

{¶ 45} In his second and third assignments of error, appellant argues that the trial court erred in convicting appellant of aggravated menacing, despite concluding he was innocent of the remaining felony charges. In so doing, appellant argues his conviction is against the manifest weight of the evidence and is contrary to law.

{¶ 46} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390. That is, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *Clemmons*, 2020-Ohio-5394 at ¶ 15. When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt. *State v. Lowry*, 12th Dist. Warren Nos. CA2019-07-070 and CA2019-07-071, 2020-Ohio-1554, ¶ 15. As noted above, questions regarding witness credibility and weight of the evidence are primarily matters for the trier of fact to decide because the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence. *Clemmons* at ¶ 16. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence "only

in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*; *Thompkins* at 387

{¶ 47} In this case, appellant was convicted of aggravated menacing in violation of R.C. 2903.21(A), which provides that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." To prove aggravated menacing, the state is not required to show that the offender is able to carry out the threat or even that the offender intended to carry out the threat. *State v. Salinger*, 12th Dist. Butler No. CA2014-10-208, 2015-Ohio-2821, ¶ 17. However, the state must show that the victim had a subjective belief of serious physical harm from the offender. *Clemmons* at ¶ 33. Evidence of a person's belief that an offender will cause serious physical harm can be proven with circumstantial evidence. *Id.*

{¶ 48} As discussed above, appellant's aggravated menacing charges concern appellant's actions toward Lucy after he learned that neither she nor Rachel posed any threat to him, his residence, his family, or Taylor. Specifically, after learning that Lucy was a child searching for a dog, appellant continued to threaten Lucy by ordering her to remain on the ground while threatening to shoot her and wielding the firearm. Only after a few minutes of arguing with Rachel did appellant allow Lucy to leave. As noted by the trial court, this threatening behavior occurred after appellant initially confronted Lucy in his yard with a firearm, which formed the basis of his felonious assault charges and their accompanying self-defense justification.

{¶ 49} Appellant initially argues that, because the trial court determined appellant did not have the requisite mens rea for the superior offenses of felonious assault and abduction, the "knowingly" mens rea element of aggravated menacing could not have been met. However, when considering the trial court's findings in their entirety, it is

apparent the trial court concluded appellant had the requisite mens rea to commit felonious assault, but that his commission of felonious assault was justified. We note that a defendant, like appellant, claiming self-defense concedes that he had the purpose to commit the act, but asserts that he was justified in his actions. *State v. Moody*, 12th Dist. Butler No. CA2021-05-052, 2022-Ohio-2529, ¶ 24, citing *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 38. "By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force." *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 54. Consequently, appellant's argument that the trial court erred in failing to conclude that he acted in self-defense is inconsistent with any challenge to the evidence of his mens rea at the time of the incident. *Id.*

**{¶ 50}** Notwithstanding the above, the plain language of R.C. 2903.21, aggravated menacing, criminalizes a person's threat of violence that creates fear or causes apprehension of serious physical harm in another person. *State v. McWilliams*, 5th Dist. Stark No. 2011-CA-00051, 2012-Ohio-663, ¶ 23. As such, even if appellant did not intend to follow through with his threats after determining Lucy was a nonthreat, his conviction for aggravated menacing is not against the manifest weight of the evidence if the record shows he was aware that his conduct would probably cause Lucy and Rachel to believe that he would seriously harm Lucy. *See* R.C. 2901.22(B).[5] In this case, appellant knew such a result was probable given their demeanors during the encounter, in addition to Lucy's young age. Additionally, Rachel and Lucy testified they believed appellant would shoot Lucy if she did not adhere to his commands and the nanny testified that Lucy was terrified, hyperventilating, and crying when she returned to Rachel's vehicle. As a result, the record establishes that appellant acted knowingly when he continued to hold Lucy at

---

5. We note that this is not the same conduct a defendant must knowingly engage in to commit abduction or felonious assault.

- 17 -

gunpoint for multiple minutes while he argued with her mother, and that Lucy and Rachel remained fearful for Lucy's life due to appellant's conduct throughout the incident.

{¶ 51} We also reject appellant's reliance on *State v. Fields*, 84 Ohio App.3d 423 (12th Dist.1992) for the proposition that his aggravated menacing conviction is contrary to law. In *Fields*, the defendant, an off-duty police officer, held a firearm in her hand while she evicted three trespassers from her property. Notwithstanding her possession of the firearm, the record showed "she did not verbally threaten the boys or directly point the gun at them." *Id.* at 428. Instead, the defendant was "pretty nice" to the trespassers and held the firearm at her waist for most of the encounter. In reversing the defendant's conviction for aggravated menacing, this court concluded that the defendant's "actions did not constitute a threat" and found that the state failed to prove that the trespassers were threatened with serious physical harm, an essential element of aggravated menacing.

{¶ 52} Based on the above, we find the facts of *Fields* distinguishable from the case at hand. Here, the record reflects appellant made several threats to shoot Lucy and Rachel, including that he would shoot Lucy in the "fucking face," and that he continued to point his weapon at Lucy and Rachel during and after voicing these threats. Accordingly, appellant's behavior was clearly distinct from the defendant's behavior in *Fields*, and the essential element of a threat existed in this case.

{¶ 53} Accordingly, we conclude this is not an extraordinary circumstance where the evidence presented at trial weighs heavily in favor of acquittal. As such, we find appellant's aggravated menacing conviction is not against the manifest weight of the evidence.

**{¶ 54}** Appellant's second and third assignments of error are overruled.

**{¶ 55}** Judgment affirmed.


S. POWELL, P.J., and BYRNE, J., concur.