[Cite as *State v. Cummings*, 2024-Ohio-6106.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                        :

    Plaintiff-Appellee,               :

                              No. 24AP-125

v.                                                            :     (C.P.C. No. 22CR-4531)

Dwayne Lamont Cummings,                 :           (REGULAR CALENDAR)

    Defendant-Appellant.           :

---

D E C I S I O N

Rendered on December 31, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *Rancour Scarsella LLC*, and *Paul L. Scarsella*, for appellant. **Argued:** *Paul L. Scarsella*.

---

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, Dwayne Lamont Cummings, appeals from a judgment of conviction entered by the Franklin County Court of Common Pleas.

## I. Facts and Procedural History

{¶ 2} On September 29, 2022, a Franklin County Grand Jury indicted appellant on two counts of murder in violation of R.C. 2903.02. The indictment stated the crime occurred on September 5, 2022. Before trial began, plaintiff-appellee, State of Ohio, dropped the first charge that alleged appellant "purposely cause[d] the death of Gregory Harden Coleman," and proceeded only on the remaining charge of felony murder that accused appellant of causing Coleman's death "as a proximate result" of felonious assault,

an offense of violence in violation of R.C. 2903.11. (Indictment at 1.) On October 4, 2022, appellant entered a plea of not guilty.

{¶ 3} A jury trial commenced on January 29, 2024. The state began by calling Cody Banks to the stand, a Columbus police officer for more than six years. Officer Banks was assigned to patrol the Short North area in the early morning hours of September 5, 2022. He was patrolling the area with his partner, Officer Nicholas Geno. Officer Banks testified that as he drove his cruiser north on High Street at approximately 2:10 a.m., they spotted a man, who turned out to be Coleman, laying half on the street and half on the sidewalk out in front of Julep, a local bar. Officer Banks stated he activated his cruiser lights, switched on his body-worn camera, informed dispatch that a person was down, and requested medics. Upon closer observation, Officer Banks noticed blood and a clear liquid coming from Coleman's left ear and the left side of his head. Officer Banks applied pressure to Coleman's head to stanch the bleeding. He observed that although there was "a little bit of blood around [Coleman's] lips, * * * the primary source of blood appeared to be coming from his ear and left side of his head." (Jan. 30, 2024 Tr. at 204-05.) Coleman was still breathing as Officer Banks attempted these lifesaving measures, but he "appeared to be completely unconscious, unresponsive," apparently unable to talk or respond to verbal cues. (Jan. 30, 2024 Tr. at 205.) Officer Banks also confirmed Coleman had no weapons on his person. The state then sought to show a clip from Officer Banks' body-worn camera, but the defense objected and asked to approach the bench. At a sidebar out of the jury's earshot, defense counsel explained his concern with showing the video evidence to the jury:

> I have been given this video, but I haven't actually viewed the portion you are playing, and I want to make sure that there's no statements from or anything ascertained at the scene, hearsay statements that might be caught on video. I assume you have watched this and you give me assurance there's nothing improper. I don't know what you are playing, I don't know what portion.

(Jan. 30, 2024 Tr. at 207.) The state maintained there was no improper hearsay statements contained in the video clip, and defense counsel consequently withdrew the objection. The body-worn camera video footage matched the testimony given by Officer Banks. Officer Banks testified that witnesses to the scene neither assisted in providing

medical care nor came forward with any information on what led to Coleman's injuries. Officer Banks then explained that once he called medics and did what he could to stabilize the neck and head, he secured the scene in preparation for the arrival of detectives from the felony assault unit. Although his partner inquired in the bar about obtaining security footage of the incident, Officer Banks took no further investigatory actions. The defense declined to cross-examine Officer Banks.

{¶ 4} The state's next witness was Officer Geno. Officer Geno has worked as a Columbus police officer for over five years. He described serving as a patrol officer with his partner, Officer Banks, in the Short North neighborhood from the night of September 4, 2022 into the early morning hours of September 5, 2022. Officer Geno was riding in the cruiser when he and Officer Banks noticed a crowd of people around a person laying on the pavement with "his back partially in the street." (Jan. 30, 2024 Tr. at 224.) Officer Geno testified that Coleman had "labored breathing" with closed eyes and was unresponsive but for "slight moans." (Jan. 30, 2024 Tr. at 225.) As Officer Banks administered first aid, Officer Geno checked to see if Coleman had any weapons on his person. Finding none, he entered the bar to ask whether any bar employee had seen what happened or had surveillance video of the incident. Officer Geno testified the responses of bar employees and other bystanders were unhelpful. Given the lack of cooperation, Officer Geno informed the jury he had little information about what caused Coleman's injuries. Without objection, the state showed video evidence from Officer Geno's body-worn camera, which depicted the same course of events he had just recounted for the jury. The defense declined to cross-examine Officer Geno.

{¶ 5} The state next called Jason Gunther to testify. Detective Gunther has worked as a detective in the felony assault unit of the Columbus Division of Police for nearly 3 years, with 22 years of total experience as a Columbus police officer. Detective Gunther explained he is called to crime scenes if the responding officers believe a felony assault has been committed. He was called in the early morning hours of September 5, 2022 to investigate an incident that occurred outside of Julep. He was informed that bystanders were uncooperative, and as a result the patrol officers on the scene had little information about how Coleman sustained his injuries. Detective Gunther described how rather than report directly to the scene, he instead visited the hospital at approximately

3:30 a.m. in the hopes of learning more about Coleman and the cause of his injury. The hospital staff provided Detective Gunther with Coleman's name and informed him that Coleman was in critical condition and not likely to survive the night. Detective Gunther then returned to Julep, but by then the bar had closed and all bystanders had departed. Upon returning to the hospital later that day, he discovered Coleman was being kept alive by a ventilator in order to allow enough time for family to visit. In the evening of September 5, 2022, Detective Gunther went to Julep to inquire further about the surveillance footage from the bar. Bar employees permitted him to watch the footage in the bar, and he testified about how the video appeared to skip in places. The owner of Julep agreed to provide the requested footage, which included video from both inside and outside of the bar. Detective Gunther explained this surveillance footage would allow investigators to learn about the events preceding the assault. Before he could continue his investigation, however, Detective Gunther received word from the hospital that Coleman was likely to soon die. At that point, Detective Anthony Johnson of the homicide division took over the case. Defense counsel briefly cross-examined Detective Gunther, clarifying his understanding of the surveillance footage's skipping and the crowd's dispersal after the assault.

{¶ 6} The state also called Sean Taylor to the stand. Detective Taylor is a digital forensics detective who has worked with the Columbus police for nearly 12 years. After outlining Detective Taylor's training and credentials, the trial court admitted him as an expert witness in the field of digital forensics. According to the state, on September 6, 2022, Julep provided Detective Johnson with the surveillance footage of the September 5, 2022 incident. Detective Taylor explained that he did not believe the skipping was caused by editing, but rather that some other factor, such as an electrical wiring issue or a motion-sensor camera, caused the video to be choppy. Detective Johnson gave the surveillance footage to Detective Taylor for further analysis. From the full footage, he extracted a 30-second video clip and, of that "sub-clip," he also took a number of frame-by-frame images. (Jan. 30, 2024 Tr. at 269.) The sub-clip and images were shown to the jury. Later, on April 18, 2023, Detective Johnson brought a video clip from Facebook to Detective Taylor for analysis. The parties stipulated "Columbus police detective Scott Polgar received an iPhone screen recording of a Facebook live video that captured the events in question in

front of Julep * * * on September 5th, 2022 at approximately 2:02 a.m." (Jan. 30, 2024 Tr. at 280.)  Detective Taylor extracted frame-by-frame images from the Facebook video, all of which were shown to the jury.  Although on cross-examination Detective Taylor testified his sub-clip of the surveillance footage was not time-stamped, the state's redirect questioning clarified the original surveillance footage was in fact time-stamped and fully available to the jury.

{¶ 7}   The state then called Zoie Clark to testify.  Clark has been a restaurant server in Columbus for about eight years.   After the September 5, 2022 incident, Clark remembered she had previously met Coleman at a bar where he was working.  Clark testified she had gone out to celebrate her friend's birthday, and her group encountered Coleman who was working as a bartender that night.  She informed the jury this was her only interaction with Coleman.  Clark testified she also happened to witness Coleman's assault as she stood on the sidewalk across the street from Julep.  Clark did not see the initial confrontation that led to Coleman's assault, but she witnessed a man dressed in black standing over Coleman's body, repeatedly hitting and yelling something at Coleman. The man in black clothing was not appellant.  Clark told the jury that Coleman "was just laying [sic] there" as he received the blows.  (Jan. 30, 2024 Tr. at 306.)  Although Clark had some idea of what was being yelled during the attack, she was not certain which words came from the aggressor and which came from bystanders.  Clark stated she never witnessed a man dressed in a white shirt and red pants hit Coleman.  Later, the state clarified that appellant was the man wearing a white shirt and red pants.  Upon approaching Coleman after the assault, Clark described him as "lifeless," his lips "sucked in," and his face "getting swollen" with his hands "out" and his body "just limp." (Jan. 30, 2024 Tr. at 311-12.)  When police arrived, Clark testified she was "pissed" at them for their response time and waited nearby until Coleman was taken away by ambulance.  (Jan. 30, 2024 Tr. at 313.)  On September 20, 2022, Clark gave her statement to the homicide detectives in charge of the case.   On cross-examination, Clark reiterated her prior testimony and agreed the events she witnessed did not account for the entirety of the assault on Coleman.

{¶ 8}   The state called Dr. Michael Caplan as its final witness.  Dr. Caplan is a forensic pathologist who has been employed by the Franklin County Coroner's Office since

July 2022. After the state conducted a review of his resume, the trial court declared Dr. Caplan an expert in the field of forensic pathology. Dr. Caplan then talked the jury through the mechanics of an autopsy. Dr. Caplan further explained that on September 18, 2022, he was asked to perform an autopsy on Coleman. He was informed that Coleman had been involved in an altercation on September 5, 2022, never again regained consciousness, and was later declared dead on September 18, 2022. The autopsy took place on September 19, 2022. According to Dr. Caplan, the autopsy revealed "[t]he cause of [Coleman's] death was complications of blunt impact to his head, and the manner of death was homicide." (Jan. 31, 2024 Tr. at 370.) Dr. Caplan explained the anatomy of a human skull to the jury using a model skull. He pointed to the left side of the skull and described how Coleman's had a "four-by-two-inch area of oozing in the frontal temporal region." (Jan. 31, 2024 Tr. at 380.) He went on, recalling that Coleman's body also had "a smaller bruise in the back of his head about two-and-a-half-by-one-and-a-half inches." (Jan. 31, 2024 Tr. at 380.) On the right side of Coleman's skull, however, it was "not possible to tell exactly where the bruises were" because doctors performed a craniotomy to remove part of the bone on that side of the head in an effort to "remove the blood and decompress the pressure on the brain." (Jan. 31, 2024 Tr. at 380-81.)

{¶ 9} Dr. Caplan testified he could not attribute any of Coleman's various brain bleeds to any particular injury Coleman sustained in the assault. Rather, Dr. Caplan agreed it was his opinion that "[c]omplications from all those injuries caused the blood." (Jan. 31, 2024 Tr. at 382.) Next, Dr. Caplan described a fracture in the base of Coleman's skull, which formed the shape of a "W" and spanned multiple fossa in the skull. Dr. Caplan believed this fracture on the base of the skull was caused by Coleman "going back and hitting his head on the concrete." (Jan. 31, 2024 Tr. at 384.) Dr. Caplan noted that during the autopsy, he discovered the front of Coleman's brain also had bruising. In his opinion, the same mechanism that caused the fracture on the base of the skull also caused this bruising—Coleman's head striking the ground scraped the front of his brain against a rough section of the skull "between the anterior and middle cavities in the base of the skull." (Jan. 31, 2024 Tr. at 390.)

{¶ 10} Next, Dr. Caplan recounted Coleman's various deep-brain hemorrhages. He discovered bruises inside the frontal lobes, "in the corpus callosum, which is the structure

that connects the right and left hemispheres," "in the middle of the brain stem," and "on the inner part of the occipital lobe." (Jan. 31, 2024 Tr. at 392.) Dr. Caplan attributed these deep hemorrhages to "the effects of rotational movement of the brain." (Jan. 31, 2024 Tr. at 393.) He was unable to link any particular hemorrhage to a specific injury, instead testifying the culprit was "the totality of the sum of all of the injuries to Mr. Coleman." (Jan. 31, 2024 Tr. at 394.) Dr. Caplan opined that just one of the blows to the head after Coleman fell to the pavement, as seen in the video, could be consistent with Coleman's deep brain injuries, and that multiple strikes to the head would likely cause more extensive deep brain damage. He agreed with the claim "[t]he totality of the circumstances of the multiple strikes * * * is part of the cause of the internal injury to the deep portions of the brain." (Jan. 31, 2024 Tr. at 394.) Dr. Caplan's testimony next explicated the bleeding from Coleman's left ear at the time police arrived on the scene was consistent with the skull fracture, as that fracture intersected with the area of the skull "where the ear canal is." (Jan. 31, 2024 Tr. at 395.) He explained the clear fluid also leaking from Coleman's left ear was likely "cerebral spinal fluid or spinal fluid" caused by "injury to the surface of the brain." (Jan. 31, 2024 Tr. at 397.) As for Coleman's apparent snoring in the police body-worn camera footage, Dr. Caplan explained how direct injury to the brain stem, "which regulates your breathing," is likely to "alter your normal taking in of air." (Jan. 31, 2024 Tr. at 396.) He postulated that is what caused Coleman to produce the involuntary snoring sounds that were audible to the responding officers.

{¶ 11} While Dr. Caplan did not include alcohol as a cause of death in his report, he noted alcohol "could have aggravated the brain injury" because of its effect in "dilat[ing] the blood vessels." (Jan. 31, 2024 Tr. at 400.) Dr. Caplan also found pre-existing health conditions in Coleman—including hypertension, high blood pressure, coronary artery disease, and a goiter—but he concluded none of these conditions contributed to Coleman's death.

{¶ 12} Next, the state showed the jury a number of autopsy photographs and had Dr. Caplan explain the relevance of certain images. Some of the photographs, for example, depicted Coleman's uninjured hands, and Dr. Caplan believed this fact demonstrated Coleman did not defend himself against the assault. In regard to his viewing of the video evidence, Dr. Caplan stated the video "did not change the cause or manner of death in my

findings, but it helped reconstruct the events to explain my autopsy findings." (Jan. 31, 2024 Tr. at 412-13.) The state then proceeded to show Dr. Caplan frame-by-frame video evidence of the assault and ask how each blow corresponded with the brain injuries Coleman sustained. At one point, Dr. Caplan opined that a blow to Coleman's head was not a slap, and was, instead, a "forceful blow." (Jan. 31, 2024 Tr. at 420.) Defense counsel objected, and the trial court sustained the objection on grounds that Dr. Caplan's opinion on the matter was argumentative in nature and had no relation to his expertise in forensic pathology. After viewing all the video footage of the assault, Dr. Caplan agreed with the state's formulation that "any one of the injuries, either in isolation or in combination, was capable of producing the clinical events that ultimately resulted in [Coleman's] death." (Jan. 31, 2024 Tr. at 425.) It also appears Dr. Caplan testified to his belief that Coleman would have lived but for "the impacts of those blows." (Jan. 31, 2024 Tr. at 427.)

{¶ 13} The defense then cross-examined Dr. Caplan. The defense asked in detail about each primary injury received by Coleman, and Dr. Caplan agreed that each would be caused only by a significant force. Dr. Caplan agreed it was impossible to say which specific blow to Coleman's head caused the tearing of the dura mater—it could have occurred on the initial blow, the fall on the pavement, or any of the blows Coleman received as he lay unconscious. Dr. Caplan reiterated he was fairly certain the injury to the frontal lobes was caused by the impact with the ground. He testified to his belief that appellant's initial blow, the one that knocked Coleman unconscious, likely caused the hemorrhage in the deeper structures of the brain. Dr. Caplan based this opinion on the fact that the video evidence showed the first blow by appellant caused Coleman's head to rotate. Further, he reasserted his opinion that any of the injuries to Coleman could have been fatal, and accordingly it was the "totality of all the injuries that in [his] opinion caused Mr. Coleman's death." (Jan. 31, 2024 Tr. at 456.) After brief redirect and recross examinations, the state rested its case.

{¶ 14} At this point, the defense moved for acquittal pursuant to Crim.R. 29. The trial court found that, viewing the evidence in a light most favorable to the state, the state presented enough evidence to meet all the elements of felony murder. Accordingly, the trial court denied the Crim.R. 29 motion for acquittal.

{¶ 15} The defense called Quintin White as its first witness. White was at Julep the night of Coleman's assault, drinking in celebration of his sister's birthday. His group consisted of appellant, Chrystian Foster, his sister Ashley Fisher, and Leanna Doyle. They arrived at Julep around 8:00 or 8:30 p.m. that night, and later that evening they were sitting at a table on the bar's outdoor patio. White testified that Coleman approached their table, seemingly inebriated, and stared at Fisher. White said that Doyle asked what Coleman was staring at, and in response, Coleman opined on Fisher's appearance. According to White, Doyle told Coleman that Fisher had a husband and was not interested in his advances. White next testified that Foster was working as Julep's security guard that night, and he warned Coleman to either move along or enter the bar. White noted that Coleman appeared unresponsive to Foster's request and continued inquiring about Fisher's relationship status. White claimed Foster asked Coleman to take a walk, but Coleman became belligerent and refused. White recounted how Coleman shouted various vulgarities, including how he planned to "blow this bitch up," referring to Foster. (Jan. 31, 2024 Tr. at 491.) Around this time, White recalled the head of Julep security Andre Turner came outside in an attempt to defuse the situation. White stated that Coleman "pushed [Turner] off and said, hey man, get out of my way." (Jan. 31, 2024 Tr. at 492.) From this point in the altercation, cell phone video captured the ensuing events. On cross-examination, the state inquired about Fisher's level of intoxication and elicited the fact that Coleman never directly stated an intention to kill. The state also established that after Coleman sustained his injuries, White did not call an ambulance before leaving the scene. Finally, the state called into question White's memory about the precise time the assault occurred.

{¶ 16} The defense next called Ashley Fisher to the stand. Fisher testified she went out on September 4, 2022 to celebrate her birthday, initially meeting up with her cousin at a billiards bar in Columbus. Fisher testified she went to Julep at approximately 1:00 a.m. to meet up with Foster as he worked security that night. Fisher sat outside at the bar's patio with appellant, Foster, White, and Doyle. She described how Coleman approached their table from the sidewalk, complimented her looks, and asked for her phone number. Fisher claimed Doyle and Foster informed Coleman that Fisher was already married and thus uninterested in his advances. Fisher said Foster then told Coleman to either go inside

the bar or continue walking. Coleman apparently took exception to this admonition and, after some argument, set down his glasses and sandwich on the sidewalk and began issuing threatening vulgarities. Fisher testified Turner exited the bar and attempted to separate Coleman and Foster. From this point on, the cell phone video captured the remainder of the altercation. On cross-examination by the state, Fisher testified she saw Foster and Coleman squaring up and witnessed Coleman "fake a punch." (Jan. 31, 2024 Tr. at 517.) The state established Fisher left the scene two to three minutes after the assault and did not call an ambulance.

{¶ 17} For its final witness, the defense called Andre Turner to the stand. Turner has worked in bar security for more than 15 years. In September 2022, Turner was employed by Julep as head of security for the bar. Turner knew appellant because he had worked for Turner for approximate 6 or 7 years, though appellant was not working at Julep the night of the assault. Likewise, Turner stated he had worked with Foster for roughly 2 to 3 years. On cross-examination, Turner testified he witnessed Foster and Coleman squaring up for a fight, and he then witnessed appellant strike Coleman in the head. The state asked whether Turner lied to investigators when he told them he did not know the identities of the men who assaulted Coleman. However, this line of questioning led Turner's testimony to become "combative at best," resulting in admonishment from the trial court and the dismissal of the witness pursuant to Evid.R. 611. (Jan. 31, 2024 Tr. at 549.) The trial court did not, however, strike the testimony provided by Turner up to the point of his dismissal.

{¶ 18} Appellant thereafter declined to testify in his own defense, and the defense rested its case. At this time, the defense renewed its Crim.R. 29 motion for acquittal that was previously raised at the close of the state's case in chief. The trial court again overruled the motion and permitted the case to proceed. The defense also requested jury instructions in both defense of another and, as a lesser-included offense of murder, involuntary manslaughter. Finding no evidence appellant acted recklessly in assaulting Coleman, the trial court declined to instruct the jury on the elements of involuntary manslaughter. The trial court also denied defense counsel's request to instruct the jury on defense of another because the evidence, even construed in appellant's favor, could not satisfy the requisite elements of self-defense or defense of another. After the trial court

issued its instructions to the jury, defense counsel objected to the exclusion of involuntary manslaughter and defense of another. The trial court overruled these objections.

{¶ 19} Following deliberations, the jury found appellant guilty of one count of murder. The trial court held a sentencing hearing on February 2, 2024 in which it sentenced appellant to an indefinite term of 15 years to life in prison. The trial court determined appellant had 500 days of jail-time credit.

{¶ 20} Appellant timely appealed.

## II. Assignments of Error

{¶ 21} Appellant presents the following four assignments of error for our review:

> [I.] THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, CONTRARY TO HIS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION.
>
> [II.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE [I], SECTION 10 OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.
>
> [III.] APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THEREBY VIOLATED DUE PROCESS OF LAW AS GUARANTEED BY THE FIFITH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE [I], SECTION 10 OF THE OHIO CONSTITUTION.
>
> [IV.] THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY ON INVOLUNTARY MANSLAUGHTER AND DEFENSE OF ANOTHER.

## III. Analysis

## A. Second and Third Assignments of Error

{¶ 22} Appellant's second and third assignments of error are interrelated and will be addressed together. The second assignment of error asserts the trial court erred in

overruling the Crim.R. 29 motion for judgment of acquittal because the evidence was insufficient to support a conviction. The third assignment of error contends his conviction was against the manifest weight of the evidence.

{¶ 23} Crim.R. 29(A) states:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

" 'Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict.' " *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 45, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.*, citing *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 16, citing *Thompkins* at 386. "In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court in reviewing the sufficiency of the evidence assumes the verity of the state's evidence and determines whether such evidence satisfies each element of the crime charged. *See Flood* at ¶ 16, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.

{¶ 24} A challenge to the manifest weight of the evidence, on the other hand, "addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386. In reviewing a challenge to the manifest weight of the evidence, an appellate court in essence acts as a "thirteenth juror" and evaluates conflicting evidence. *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court examines " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Appellate courts owe great deference to the jury's assessment of witness credibility because a jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." (Internal quotations omitted.) *State v. Huber*, 10th Dist. No. 18AP-668, 2019-Ohio-1862, ¶ 32, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984); *see State v. Gullick*, 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 11.

{¶ 25} Appellant challenges his conviction for felony murder. R.C. 2903.02(B) provides "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." The state asserted appellant caused the death of Coleman as a proximate result of committing felonious assault in violation of R.C. 2903.11(A)(1). Felonious assault is an offense of violence and a felony of the second degree. R.C. 2901.01(A)(9)(a) and 2903.11(D)(1)(a).

{¶ 26} Here, the evidence was sufficient to support appellant's conviction for felony murder, and the conviction was not against the manifest weight of the evidence. Appellant argues that while he admittedly caused serious physical harm to Coleman, he did not do so knowingly. On the record before us, this defense is preposterous. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The video evidence alone depicts appellant forcefully and repeatedly striking Coleman, and witness testimony in this case simply corroborated that which was plain to see in footage of the attack. Appellant must have been aware that such conduct would "probably cause" Coleman severe bodily injury. R.C. 2901.22(B). It is inconceivable that appellant was unaware his punches would greatly harm Coleman, especially in light of the fact that appellant continued his attack after he rendered Coleman unconscious. Thus, the evidence comports with the jury finding that appellant knowingly caused "serious physical harm to another" and thereby committed felonious assault. R.C. 2903.11(A)(1). As the

uncontroverted evidence established Coleman died as a proximate result of the injuries sustained from this felonious assault, the evidence was sufficient to conclude appellant committed felony murder. *See* R.C. 2903.02(B). Construing the evidence in a light most favorable to the state, we conclude a rational trier of fact could have reached these conclusions beyond a reasonable doubt. There was, therefore, sufficient evidence to conclude appellant committed felony murder, and the trial court properly overruled appellant's Crim.R. 29 motion for acquittal.

{¶ 27} The manifest weight of the evidence also supports appellant's conviction for felony murder. In so finding, we defer to the jury's assessment of witness credibility. *See Huber* at ¶ 32. Based on this court's extensive review of the entire record in this case, we conclude the jury neither lost its way nor created a manifest miscarriage of justice in finding appellant guilty of felony murder.

{¶ 28} Accordingly, we overrule appellant's second and third assignments of error.

## B. Fourth Assignment of Error

{¶ 29} Appellant's fourth assignment of error contends the trial court erred in failing to instruct the jury on defense of another and the lesser-included offense of involuntary manslaughter.

{¶ 30} "[A]n appellate court reviews a trial court's refusal to instruct the jury on a lesser-included offense under the abuse of discretion standard." *State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 32, citing *State v. Coleman-Muse*, 10th Dist. No. 15AP-566, 2016-Ohio-5636, ¶ 8. A trial court is required to instruct the jury on a lesser-included offense "only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense." (Internal quotations omitted.) *State v. Spirnak*, 10th Dist. No. 19AP-261, 2020-Ohio-6838, ¶ 46, quoting *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

{¶ 31} To prove the trial court erred in omitting a lesser-included offense from the jury instructions, appellant must show the evidence would reasonably support an acquittal on the charged felony murder count. In order to acquit appellant of felony murder, the jury would have had to determine appellant did not knowingly cause serious physical harm to Coleman. *See* R.C. 2903.11(A)(1) and 2903.02(B). Given the overwhelming strength of

the evidence against appellant, however, the only reasonable conclusion was that appellant acted knowingly. As already discussed, the extent of the harm appellant inflicted on Coleman was not merely the result of one punch in a drunken bar fight. Appellant's initial punch knocked Coleman unconscious, and both he and Foster proceeded to strike Coleman's defenseless head. On this evidence, a jury would have no sensible choice but to find appellant acted knowingly and so find him guilty of felony murder. In other words, a lesser charge with a lesser mens rea would not be credible due to the incontrovertible evidence that appellant acted knowingly. The trial court, therefore, did not abuse its discretion in denying defense counsel's request to instruct the jury on the lesser-included offense of involuntary manslaughter.

{¶ 32} Next, appellant argues the trial court erred in denying his request to instruct the jury on defense of another. "[A] requested jury instruction should be given if it is a correct statement of law and applicable to the facts of the case, and if reasonable minds might reach the conclusion sought from the requested instruction." *State v. Cameron*, 10th Dist. No. 23AP-635, 2024-Ohio-2427, ¶ 20, citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "Defense of another is a variation of self-defense." *State v. Moss*, 10th Dist. No. 05AP-610, 2006-Ohio-1647, ¶ 13. As with self-defense, a claim of defense of another involves two distinct evidentiary burdens. *See Cameron* at ¶ 22, citing *State v. Palmer*, 174 Ohio St.3d 561, 2024-Ohio-539, ¶ 17-19. "First, the defendant must satisfy his burden of production, meaning the trial evidence must ' "tend[] to support" '— or be legally sufficient to establish—defendant's contention that he used the force in self-defense" or in the defense of another. *Id.* at ¶ 23, quoting *Palmer* at ¶ 15, quoting R.C. 2901.05(B)(1). The defendant satisfies this burden if the evidence presented "would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant." (Internal quotations omitted.) *Id.*, quoting *Palmer* at ¶ 20, quoting *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 25. Once the trial court determines the defendant met this burden of proof, the burden shifts to the state to disprove an element of self-defense or defense of another beyond a reasonable doubt. *Id.* at ¶ 24, citing *Palmer* at ¶ 17-19, *Messenger* at ¶ 18-24, *State v. Knuff*, 175 Ohio St.3d 82, 2024-Ohio-902, ¶ 191, and *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31. The state's burden of persuasion, however, "is not triggered

until the defendant produces 'legally sufficient evidence' for every self-defense element." *Id.*, quoting *Messenger* at ¶ 19, 25.

{¶ 33} In this case, the trial court declined to issue a jury instruction on defense of another because it found appellant failed to meet his initial burden of production. On appeal, we view the evidence in a light most favorable to appellant and determine whether such evidence could convince a jury, beyond a reasonable doubt, that appellant was acting in defense of another. *Id.* at ¶ 26, citing *Palmer* at ¶ 21, citing *Messenger* at ¶ 25-26. We review a trial court's denial of a requested jury instruction for an abuse of discretion. *Id.* at ¶ 27, citing *Palmer* at ¶ 16.

{¶ 34} "An actor is legally justified in using force only when the person he is aiding would have been justified in using force to defend him or herself." *State v. Betliskey*, 8th Dist. No. 101330, 2015-Ohio-1821, ¶ 26, citing *State v. Wilson*, 2d Dist. No. 22581, 2009-Ohio-525, ¶ 38. Appellant was entitled to a defense-of-another jury instruction if he proved: (1) appellant and Foster were not at fault in instigating the fracas; (2) appellant reasonably believed they were in imminent danger of death or great bodily harm and could escape only by employing deadly force; and (3) appellant and Foster did not violate a duty to retreat. *See Cameron* at ¶ 31, quoting *Palmer* at ¶ 23, quoting *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Regarding the third element, Ohio law dictates a person has no duty to retreat prior to resorting to the use of defensive force "if that person is in a place in which the person lawfully has a right to be." (Internal quotations omitted.) *Id.*, quoting *Palmer* at ¶ 23, quoting R.C. 2901.09(B).

{¶ 35} It is evident from the record before us the trial court did not err in denying appellant's request to instruct the jury in defense of another. Appellant claimed his attack of Coleman was in defense of Foster, but that story belies the facts. However unpleasant Coleman's words may have been to appellant and his friends, Foster played a role in intensifying the conflict. Multiple witnesses confirmed they saw Foster square up for a fight with Coleman—not exactly the sort of behavior that indicates an effort to avoid the altercation. It is implausible in this case that appellant believed Foster was in imminent danger of death or great bodily harm which could be avoided only by use of deadly force. *See id.* at ¶ 31, quoting *Palmer* at ¶ 23, quoting *Messenger* at ¶ 14, quoting *Barnes* at 24. Under any reasonable interpretation of the facts, a jury could not find that self-defense or

defense of another justified appellant's actions. Because appellant so plainly failed to meet his burden of production before the trial court, the burden never shifted to the state to disprove his claims. The trial court thus did not abuse its discretion in refusing to instruct the jury on defense of another.

{¶ 36} Accordingly, we overrule appellant's fourth assignment of error.

**C. First Assignment of Error**

{¶ 37} Finally, we address the first assignment of error wherein appellant maintains he was denied the effective assistance of counsel.

{¶ 38} To prevail on a claim of ineffective assistance of counsel, a defendant "must satisfy a two-prong test." *State v. Stewart*, 10th Dist. No. 18AP-496, 2020-Ohio-1245, ¶ 11. A defendant first "must demonstrate that his trial counsel's performance was deficient." *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). A defendant then "must establish that the deficient performance prejudiced his defense." *Id.*, citing *Strickland* at 687, and *Bradley* at 141-42.

{¶ 39} Appellant cites four deficiencies in the performance of his trial counsel. First, appellant argues his counsel's failure to call an independent expert to testify constituted ineffective assistance of counsel. To appellant, an independent expert could have provided an opportunity to raise some novel, unspecified defense. However, "[t]he decision whether to call a witness is generally a matter of trial strategy." *State v. J.M.*, 10th Dist. No. 14AP-621, 2015-Ohio-5574, ¶ 32, citing *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 40. With so many factors at play in constructing a defense in a jury trial, appellate courts are not well-positioned to scrutinize defense counsel's decision about whether to call an independent expert. For example, perhaps defense counsel in this case determined that prolonged focus on the severe injuries inflicted by his client would gain no favor among the jury. Defense counsel may have calculated it better to raise doubts about causation, an essential element of the felony murder charge, than to continually remind the jury of the gory consequences of his client's actions that night. Even worse, appellant's brief fails to specify what this hypothetical competing expert might have called into question about Dr. Caplan's testimony. Regardless of whether one trial strategy might have proven more effective than another, "[t]he failure to call an expert witness and instead rely on cross-examination does not constitute ineffective assistance of counsel."

*Roush* at ¶ 40, citing *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 90 (10th Dist.), citing *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001).

**{¶ 40}** Second, appellant argues his defense counsel's cross-examination of Dr. Caplan was not effective. However, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. "[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." (Internal quotations omitted.) *State v. Burns*, 10th Dist. No. 23AP-336, 2024-Ohio-1669, ¶ 39, quoting *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 40. Appellant's conclusory challenge to his defense counsel's cross-examination of Dr. Caplan is thus entirely without merit.

**{¶ 41}** Third, appellant questions his trial counsel's decision to stipulate to appellant's identity in the video footage. The evidence presented overwhelmingly identified appellant as one of Coleman's attackers—so corroborated by the surveillance footage, the cell phone video, and the testimony of multiple witnesses. Furthermore, even if this stipulation as to appellant's identity was somehow deficient performance, "[t]he burden is on the defendant to establish that he was prejudiced" by the stipulation. *State v. Royal*, 8th Dist. No. 93903, 2010-Ohio-5235, ¶ 17, citing *Bradley* at paragraph one of the syllabus. Appellant failed to show any prejudice, and defense counsel's stipulation as to appellant's identity therefore did not constitute ineffective assistance of counsel.

**{¶ 42}** Fourth, appellant claims his trial counsel failed to examine all the evidence in preparation for trial. This allegation stems entirely from defense counsel's statement to the trial court in a sidebar, out of the jury's earshot, that he was not sure what portion of the body-worn camera footage the state was about to present to the jury. Defense counsel wanted to ensure the clip did not contain any impermissible hearsay. Any reasonable interpretation of the record in this case would find defense counsel merely wanted to be certain that an upcoming video to be played to the jury—the state's chosen clip taken from the full-length video—would not contain inadmissible statements detrimental to his client.

Defense counsel's sidebar comment did not constitute deficient performance, and, regardless, appellant failed to show any resulting prejudice.

{¶ 43} On review of the record before us, we find no ineffective assistance of counsel. Accordingly, we overrule appellant's first assignment of error.

**IV. Conclusion**

{¶ 44} Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

———————————